**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| ANTONIO R. RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:05-CV-265 PS |
| | ) | |
| ISG INDIANA HARBOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Antonio Rodriguez, an employee of ISG Indiana Harbor, Inc. was assigned to the least favorable position within his job classification. He blamed his supervisor for this assignment as well as for a perceived lack of training and overtime, and therefore he filed a grievance against his supervisor claiming discrimination. Although the grievance was resolved, matters did not improve for Plaintiff. Accordingly, he filed a complaint against his employer alleging national origin discrimination and retaliation. For the following reasons, the Court now **GRANTS** Defendant's Motion for Summary Judgment.

**FACTUAL BACKGROUND**

**A.     Facts Relating to Plaintiff's Employment**

Indiana Harbor operates a steel production and finishing mill in East Chicago, Indiana. (8/14/06 Reinhold Aff. ¶ 3, Def. Mot. Ex. B.) Indiana Harbor purchased the mill from the previous owner, LTV Steel. (Pl. Dep. at 12-14, Pl. Resp. Ex. 1.) In May 2002, Indiana Harbor hired David Reinhold to serve as the Mechanical Maintenance Manager of the hot strip mill department. (8/14/06 Reinhold Aff. ¶ 3.) Reinhold held this position until July 1, 2004 when

Dave Vena assumed the role.  (*Id.*; Pl. Dep. at 15; Vena Aff. ¶ 5, Def. Mot. Ex. C.)  The manager

was responsible for 62 Maintenance Technicians-Mechanical ("MTM" classification), one of

whom was Plaintiff.  (8/14/06 Reinhold Aff. ¶ 3; Pl. Dep. at 14-15, 25.)  MTMs were generally

responsible for performing mechanical functions necessary to maintain all operating and service

equipment of the hot strip mill.  (8/14/06 Reinhold Aff. ¶ 5 & Ex. B-2.)

Defendant had the contractual right under the labor agreement to assign all employees

within the MTM job classification to perform any of the MTM assignments, without regard to

seniority or years of service.  (*Id.* at ¶¶ 6, 12.)  It also had the right to change assignments at any

time to suit the company's needs.  (*Id.* at ¶ 6.)  Assignments were made based on the skills

required for the position and the skills possessed by the employee.  (*Id.* at ¶ 12.)  In the event

MTMs of equal skill and ability were vying for a specific assignment, the manager, in his

discretion, could choose to consider seniority.  (*Id.*)  Reinhold did not consider seniority in

making assignments for the MTMs.  (*Id.*)  Vena, on the other hand, considered seniority when

equally capable MTMs were seeking the same assignment.  (Vena Aff. ¶ 5.)

There were three general assignments within the scope of the MTM job classification: (1)

"roll rack;" (2) "crew" (either at the coiler or the mill); and (3) "systems."  (8/14/06 Reinhold

Aff. ¶ 7; Pl. Dep. at 25-28.)  Regardless of their particular assignment, all MTMs earned the

same hourly rate and incentive under the terms of the labor agreement.  (8/14/06 Reinhold Aff.

¶¶ 7, 13; Pl. Dep. at 29.)  The primary difference between the assignments was the amount of

individual personal responsibility that the MTM must possess to ensure his assignment was

completed properly.  (8/14/06 Reinhold Aff. ¶ 13.)  When deciding who should be assigned to

one of the more critical jobs, the managers considered the person's desire, accountability,

responsibility and motivation.  (*Id.*)

The "roll rack" assignment involved more routine tasks and did not require as high a skill set as the other assignments.  (*Id.* at ¶ 9.)  This assignment was also more structured and suited employees who struggled with self-direction.  (*Id.*)  By contrast, an MTM assigned to "crew" must demonstrate a higher skill set than "roll rack" to enable him to identify problems in the mill and efficiently make necessary repairs.  (*Id.* at ¶ 10.)  He must also demonstrate a high degree of personal desire, drive, motivation, responsibility and accountability.  (*Id.*)  Finally, the "systems" assignment was a tremendous responsibility as the MTM was responsible for all the systems critical to the operation of the entire mill.  (*Id.* at ¶ 11.)  This job required employees with a high degree of personal desire, drive, motivation, responsibility and accountability because it was difficult to monitor the work done by those assigned to "systems."  (*Id.*)  This was the single most important MTM assignment.  (*Id.*)  Before being assigned to systems or other jobs requiring more self-direction, MTMs must demonstrate their personal desire, motivation, responsibility and accountability.  (*Id.* at ¶ 13.)

Plaintiff is of Puerto Rican descent.  (Pl. Dep. at 6-7, 20.)  Neither Reinhold nor Vena, Plaintiff's supervisors, asked him or any other MTM about his national origin.  (8/14/06 Reinhold Aff. ¶ 8; Vena Aff. ¶ 2.)  Reinhold did not know Plaintiff's national origin until Plaintiff filed his Charge of Discrimination in April 2004.  (8/14/06 Reinhold Aff. ¶ 8.)  Vena did not know Plaintiff's national origin until the EEOC investigation in August 2004.  (Vena Aff. ¶ 2.)  Plaintiff stated that he did not tell anyone at work that he was Puerto Rican and that there was no way for management at Indiana Harbor to know that fact.  (Pl. Dep. at 70, Def. Mot. Ex. A.)

3

Plaintiff previously worked for LTV Steel before it ceased operations.  (*Id.* at 14.)
Plaintiff held various positions at LTV.  (*Id.* at 6.)  He also participated in the MTM
apprenticeship program at LTV's caster department, and he was a MTM at the caster.  (*Id.* at
14.)  When LTV was sold, Plaintiff was unemployed for seven months before being hired by
Indiana Harbor in August 2002.  (*Id.* at 13-14.)  Plaintiff was hired as a MTM in the hot strip
mill, and continues to hold this position.  (*Id.*; Vena Aff. ¶ 7.)

Plaintiff's manager, Reinhold, noted that Plaintiff required a highly structured job
assignment to help him succeed with finishing assignments.  (8/14/06 Reinhold Aff. ¶ 14.)
Reinhold didn't believe that Plaintiff had demonstrated any of the personal skills required for a
more critical job assignment.  (*Id.*)  For example, Plaintiff was found sleeping on the job in
August 2003, which Reinhold saw as evidence of Plaintiff's lack of initiative.  (*Id.*; Pl. Dep. at
93-94.)  Reinhold therefore assigned Plaintiff to the roll rack because he determined that Plaintiff
failed to demonstrate the requisite personal skills to perform other assignments.  (8/14/06
Reinhold Aff. ¶ 14.)  Reinhold also considered that Plaintiff was new to the department, had
insufficient experience in the other job assignments, and had demonstrated poor competence as
indicated by his low maintenance test scores.  (*Id.*)  Specifically, in 2002, Indiana Harbor set
higher standards of performance and, to that end, gave its employees craft tests.  The testing
records showed that Plaintiff did not pass any of the testing categories.[1]  (*Id.* & Ex. B-3.)
Reinhold thus concluded that other MTMs were more qualified for the less structured
assignments.  (*Id.* at ¶ 15.)  Plaintiff testified that Reinhold told Plaintiff that he lacked the

_____

[1]  Plaintiff, however, stated in his deposition that he did not take any tests that evaluated
his qualifications for the different assignments.  (Pl. Dep. at 52.)

4

initiative to be moved off the roll rack.  (Pl. Dep. at 64.)

   In his deposition, Plaintiff claimed that Reinhold inappropriately assigned junior employees (Mickey McCarley, James Simko, Frank Kresich, Ben Benedict and Randy Brown) to more preferable assignments.  (Pl. Dep. at 33-34, 75-76.)  Reinhold assigned these employees to those assignments because of their work experience, demonstrated abilities and work attitude.  (8/14/06 Reinhold Aff. ¶ 16.)  As to each of these other employees, Reinhold testified as follows:  McCarley was already working the crew assignment when Plaintiff began working in the hot strip mill, and he was therefore experienced and he also demonstrated strong skills and good attitude.  (*Id.*)  Simko also was working the crew assignment when Plaintiff began working in the hot strip mill.  (*Id.*)  He too was experienced in working crew and demonstrated strong skills and attitude.  (*Id.*)  Kresich sometimes helped with the "systems" assignment while working the crew assignment, and therefore became more familiar with "systems" and demonstrated an ability to handle that assignment.  (*Id.*)  He showed solid skills in systems, and had the personal drive, accountability and responsibility to handle the assignment.  (*Id.*)  Benedict was already working the systems job when Plaintiff began working in the hot strip mill.  (*Id.*)  Benedict had good skills, a good attitude, and tested well.  (*Id.*)  Finally, Brown was working the systems job when Plaintiff began working in the hot strip mill.  (*Id.*)  He also demonstrated good skills, work ethic and personal motivation.  (*Id.*)

   Two other employees who were assigned to the more favorable positions were Hispanic (Simon Mendez and Mark Hernandez), and the Plaintiff readily admits this.  (Pl. Dep. at 70, 78.)  Reinhold had assigned Mendez to the crew position because he had demonstrated strong abilities, proper work ethic, a good attitude, and commitment on the roll rack, and had previous

5

experience with crew at LTV Steel.  (8/14/06 Reinhold Aff. ¶ 17.)  Reinhold had assigned

Hernandez to the crew position for many of the same reasons. (*Id.*)

For his part, Plaintiff stated that all MTMs were qualified for any of the three

assignments.  (Pl. Dep. at 52.)  From his viewpoint, the employees were fungible; he didn't see

any difference between his ability and those who were junior.  (*Id.* at 53, Pl. Resp. Ex. 1.)

In July 2004, Vena took over the position of Maintenance Manager.  (Vena Aff. ¶ 5.)

With regard to roll rack assignments, he, in exercising his management discretion, generally

assigned the three junior MTMs on each shift to roll rack, unless a senior MTM wished to work

the roll rack or a junior MTM's skills and abilities were more appropriately assigned to another

job.  (*Id.*)  Under Vena's management, Plaintiff was one of the three junior men working on his

shift.  (*Id.* at ¶ 6.)  Therefore, Plaintiff's assignment to the roll rack was consistent with Vena's

general practice regarding the roll rack assignment.  (*Id.*)

During Reinhold's tenure, MTMs could train on their regular work days during idle time.

(10/13/06 Reinhold Aff. ¶ 2.)  Plaintiff chose not to do this;  he was adamant that management

should train him by reassigning him to a new position during his regular shift.  (*Id.*)

Additionally, MTMs, including Plaintiff, had the opportunity to voluntarily come in on their

days off at overtime rates to perform on-the-job training.  (*Id.*)  Plaintiff did not wish to do this.

(*Id.*)  However, several other MTMs trained both during their idle time and their days off, thus

demonstrating their personal initiative, motivation and desire to learn new skills.  (*Id.*)

At some point during Vena's management, Plaintiff asked him for training during

downtime.  (Pl. Dep. at 30-31.)  According to Plaintiff, Vena wouldn't do it and said that

Plaintiff had to prove himself to Vena.  (*Id.*)  Plaintiff responded: "Why do I have to prove

6

myself to you?  Nobody else has.  You just assign them." (*Id.* at 31.)  Plaintiff denied that there was any discussion that he had to complete his training during his days off.  (*Id.* at 36.)  He also stated that nobody had to come in on their days off for training and that everyone else was trained during regular hours.  (*Id.*)  Yet, he also testified that "[n]obody was given training. Everybody was just put on the job."  (*Id.* at 69, Def. Reply Ex. A.)  Specifically, Plaintiff stated that non-Puerto Rican MTMs also were not given preferable job assignments or training, but he was the only one to file a complaint or pursue a charge.  (*Id.* at 32-33.)  Plaintiff nonetheless still believed that he was not given preferable job assignments or training because "[he] filed [his] complaints, . . . and [Reinhold] didn't like complaints filed against him."  (*Id.*; *id.* at 64 (Plaintiff asserting that Reinhold agreed to provide Plaintiff with training for the better jobs when Reinhold settled in the second step, but he never trained Plaintiff).)

Plaintiff also complained that Defendant did not offer him overtime.  (*Id.* at 19, Pl. Resp. Ex. 1.)  He accused Defendant of only asking Caucasians for overtime rather than having an "equal and fair" policy regarding the distribution of overtime.  (*Id.* at 20-21.)  Plaintiff admitted that he did not tell his supervisors that he wanted to work more overtime.  (*Id.* at 22.)  According to Defendant, if an MTM was interested in working overtime, the MTM need only advise management and the MTM would be so scheduled.  (10/13/06 Reinhold Aff. ¶ 3.)  Plaintiff therefore was not denied overtime opportunities; he simply preferred not to work overtime and choose not to do so.  (*Id.*)

In the beginning of January of 2006, Plaintiff's assignment changed from "roll rack" to "crew"  – his preferred assignment – as he was no longer one of the three junior men on the shift crew.  (Pl. Dep. at 27-28, 48; Vena Aff. ¶ 7.)

**B.      Facts Relating to Plaintiff's Complaint of Discrimination**

In November 2003, Plaintiff filed a grievance with his union, claiming discrimination because he was not permitted to exercise his seniority with respect to job assignments.  (Pl. Dep. at 31-32; 8/14/06 Reinhold Aff. ¶ 2 & Ex. B-1.)  The grievance was denied in the first step because there was no violation of the collective bargaining agreement.  (10/13/06 Reinhold Aff. ¶ 4.)  The union sided with management; Plaintiff's job assignment did not violate the labor agreement.  (*Id.*)  Plaintiff then appealed the Step 1 determination to Step 2.  (8/14/06 Reinhold Aff. ¶ 2 & Ex. B-1.)

During this step, as a show of good faith, Defendant agreed to settle the grievance by sending Plaintiff to welding training and transferring a portion of his roll rack work to another shift.  (*Id.*; Compl. Ex. 1.)  Defendant provided a schedule for the week ending April 10, 2004 to prove that Plaintiff was sent to training.  (8/14/06 Reinhold Aff. Ex. B-4.)  Plaintiff nonetheless maintains that he never got the training.  (Pl. Dep. at 34-35.)

In April 2004, Plaintiff filed a charge of national origin discrimination with the East Chicago Human Rights Commission.  (Pl. Dep. at 29; Am. Compl. ¶ 4 & Ex. 1.)  Plaintiff complained that Indiana Harbor had denied him contractual seniority rights since October 2002 by assigning preferable jobs to junior employees rather than him.  (Compl. Ex. 1.)  He noted in his Charge of Discrimination that he had filed a grievance in November 2003, which had been settled in the second step.  (*Id.*)  He alleged, however, that he was still being denied the right to exercise his seniority rights by Reinhold as junior employees (non-Puerto Rican) were given preferable job assignments.  (*Id.*)

In December 2004, the East Chicago Human Rights Commission accepted the

recommendation of Probable Cause in Plaintiff's case. (Compl. Ex. 2.) Once a conciliation agreement was drawn up, Indiana Harbor could either sign the agreement or negotiate any differences. (*Id.*) According to Plaintiff, the conciliation did not result in a resolution of the charge. (Am. Compl. ¶ 6; Pl. Dep. at 37.) Then in May 2005, the EEOC issued a right-to-sue letter after notifying Plaintiff that it was terminating the processing of his claim. (Compl. Ex. 3.)

Plaintiff filed this lawsuit in July 2005, alleging discrimination based on national origin and retaliation in violation of Title VII of the Civil Rights Act. Plaintiff further claimed that the alleged discrimination violated 42 U.S.C. § 1981. Specifically, Plaintiff alleged in his Amended Complaint that he was denied preferable job assignments despite his seniority because he was Puerto Rican. (Am. Compl. at 2-3.) However, in his Response to summary judgment, Plaintiff changed the claim. He now alleges that he did not receive training and he was not asked to work overtime because he was Puerto Rican.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). Employment discrimination cases, while often turning on factual questions, are nonetheless amenable to summary judgment

when there is no genuine dispute of material fact or there is insufficient evidence to demonstrate

the presence of the alleged motive to discriminate.  *Cliff v. Board of School Comm'r*, 42 F.3d

403, 409 (7th Cir. 1994).

**A.      Title VII and Section 1981 Claims**

Title VII makes it an unlawful employment practice for an employer to discriminate

based on national origin.  42 U.S.C. § 2000e-2(a)(1).[2]  To prevail on a claim of disparate

treatment, a plaintiff must establish that he is the victim of intentional discrimination on account

of his national origin.  *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999).  A

plaintiff may establish this discrimination through either the "direct" or "indirect" method of

proof.  *Id.*  In this case, Plaintiff offers no direct proof of discrimination.  Therefore, the Court

will analyze Plaintiff's three claims – denial of preferable job assignments, failure to train, and

failure to offer overtime – under the "indirect" method of proof.  This requires a plaintiff to first

establish a *prima facie* case of discrimination by showing that: (1) he is a member of a protected

class; (2) he performed the job satisfactorily; (3) he suffered an adverse employment action; and

(4) he was treated less favorably than one or more similarly situated employees outside of his

protected class.  *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir.

2002); *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000).

If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to

present evidence of a legitimate, non-discriminatory reason for the adverse employment action.

---

[2] Title VII claims and claims under § 1981 are analyzed in the same way.  *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004) (noting that § 1981 and Title VII are evaluated under the same rubric and thus, there is no need to address them separately).  For ease of reference we will refer only to Title VII in this opinion.

*Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002).  If such a reason is

supplied, then the employee must show that the stated reason is merely a pretext for unlawful

discrimination.  *Id.*  Pretext "means more than an unusual act; it means something worse than a

business error; 'pretext' means deceit used to cover one's tracks."  *Kulumani v. Blue Cross Blue*

*Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

Plaintiff fails to establish a *prima facie* case because he does not demonstrate that Indiana

Harbor treated similarly situated but non-Puerto Rican persons differently than it treated him.

Further, he cannot establish that Indiana Harbor's explanation is pretextual.

### 1.   *Prima Facie* **Case**

Plaintiff has failed to establish the fourth prong of the *McDonnell Douglas* test.[3]  This

part of the analysis requires Plaintiff to point to non-Puerto Rican employees who were

"similarly situated [to him] with respect to performance, qualifications, and conduct[.]"

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003).

As the Seventh Circuit has stated, "In determining whether [] employees are similarly situated a

court must look at all relevant factors, the number of which depends on the context of the case."

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citation omitted).

Plaintiff's first claim is that he was denied preferable job assignments.  Plaintiff's

Response brief never mentions ***any*** similarly situated individuals outside the protected class who

were treated better than Plaintiff.  Although we are not required to do so, *see Corley v. Rosewood*

*Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004), the Court endeavored to root out

---

[3]  Defendant also argues that Plaintiff has not meet the second and third prongs of the
*McDonnell Douglas* test.  The Court need not decide the merits of this assertion as Plaintiff's
failure to fulfill the fourth prong of the test is enough to deny his claim.

potential comparators by reviewing Plaintiff's deposition.

In his deposition Plaintiff mentioned that Reinhold favored certain junior employees, including Randy Brown, Frank Kresich, James Simko, Ben Benedict, Mickey McCarley, and Mark Hernandez, by giving them preferred assignments over himself.  But these employees were not similarly situated to Plaintiff.  Defendant has shown through Reinhold's affidavit that these employees were vastly superior to Plaintiff in terms of their performance, qualifications, conduct and attitude.  Plaintiff, in his Response, has not rebutted Defendant's evidence in any way.  Thus, Reinhold's affidavit describing the "junior" employees' skills and attitude demonstrates that these workers were not similarly situated to Plaintiff.  *See Balderston*, 328 F.3d at 324-25 (finding that more experienced and knowledgeable employees were not similarly situated to the plaintiff); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 738 (7th Cir. 2006) (same).

Furthermore, the Court is not convinced that these employees are actually "junior" to Plaintiff because Reinhold's affidavit states that McCarley, Simko, Benedict, and Brown were all already working their assignments when Plaintiff began working in the hot strip mill.  To reiterate, Plaintiff has not provided ***any*** specific evidence regarding ***any*** similarly situated individuals to rebut the statements made by Reinhold.

Plaintiff mentioned in his deposition that various co-workers would testify on his behalf during trial that junior, white employees were given preferable job assignments.  (*See, e.g.,* Pl. Dep. at 64, 75.)  However, none of these individuals provided an affidavit or deposition testimony for Plaintiff's summary judgment response – let alone provided evidence demonstrating that the referenced "junior" employees were similarly situated to Plaintiff.  Accordingly, Plaintiff fails to establish the fourth prong of the *McDonnell Douglas* test for his

12

claim that he was denied preferable job assignments.

Next, we review Plaintiff's allegations that Defendant failed to train him for the better job assignments.  To establish a *prima facie* case of discrimination for failure to train, Plaintiff must show that: (1) he is a member of a protected group; (2) Defendant provided training to its employees; (3) he is eligible for training; and (4) he was denied training given to other similarly situated employees who were not members of the protected group.  *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).

Again, Plaintiff does not provide any evidence relating to the fourth element of the test.[4] He does not identify any person who was treated more favorably than Plaintiff with respect to training.  Conclusory allegations stating that other employees received training are insufficient to defeat a motion for summary judgment.  *See Krchnavy*, 294 F.3d at 877.  As the Seventh Circuit has explained, "the mere fact that Caucasian employees may have received more training than [plaintiff] falls short of raising an inference of discrimination.  [Plaintiff] must come forward with *specific* evidence showing that [he] was similarly situated to Caucasian employees who received more training."  *Pafford*, 148 F.3d at 668 (emphasis added).

Plaintiff in his Response emphasizes that supervisor Vena told Plaintiff that he would need to prove himself after Plaintiff asked for training.  Plaintiff then told Vena that nobody else had to prove himself.  This exchange is not evidence of similarly situated employees who were

---

[4]  Because Plaintiff raised different claims in his Response than those he alleged in his Amended Complaint, Defendant was forced to respond to those newer claims in its Reply.  The Court acknowledges that, according to the usual briefing schedule, Plaintiff then did not have a chance to respond to Defendant's Reply.  However, Plaintiff never asked for leave to file a sur-reply, which would have given him an opportunity to argue any pretext.  Regardless, this discussion is academic because Plaintiff never established his *prima facie* case for any of his discrimination claims.

13

given training.  Plaintiff must expressly show that specific similarly situated non-Puerto Rican employees were provided training that Plaintiff was denied.  *See Peters*, 307 F.3d at 546.  He has not done so.  Indeed, the evidence is to the contrary because Plaintiff testified that certain non-Puerto Rican employees were treated the same as Plaintiff and not provided with better job assignments or training.  (Pl. Dep. at 33.)

Finally, Plaintiff complains that Defendant failed to offer him overtime.  (Pl. Resp. at 8.)  But once again he has not presented any evidence to fulfill the similarly situated prong.  *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (affirming grant of summary judgment where the plaintiff did not identify any similarly situated individuals).  Although he generally stated in his deposition that Caucasian employees were offered overtime, he fails to point to any specific evidence that would indicate he was similarly situated to those employees.  *See Radue*, 219 F.3d at 619 (noting what the plaintiff must show to fulfill the similarly situated requirement).  It is Plaintiff's burden to present evidence of his *prima facie* case, and he has not overcome it.

### 2.    Pretext

Even if Plaintiff had established a *prima facie* case for discrimination, Defendant has presented legitimate non-discriminatory reasons for its management decisions relating to work assignments, level of training, and overtime given to Plaintiff.  Plaintiff, by contrast, has countered with absolutely no evidence that those reasons were a pretext for discrimination.  Indeed, one could search high and low in Plaintiff's brief for a discussion of the pretext issue and – aside from the general statement that the law requires such proof– one would not find it.

Plaintiff was assigned to the roll rack because Reinhold determined that Plaintiff failed to

14

demonstrate the necessary desire, drive, accountability, responsibility and motivation to perform the other more preferable assignments.  Getting caught sleeping on the job (like Plaintiff was) might lead an employer to that conclusion.  To further support Reinhold's evaluation, Plaintiff did not pass any of the maintenance testing categories.[5]  Moreover, Plaintiff was newer to the hot strip mill department and had less experience in the preferable assignments as compared to other employees.  Thus, Reinhold determined that the other employees were more qualified for the preferable assignments than Plaintiff was.

The burden now shifts to Plaintiff to show that Defendant's reasons were pretextual.  Plaintiff has not even attempted to do so.  He did not even make any mention of pretext in his Response except when stating the law.  This is clearly inadequate.

Even if we try to find a potential pretext on behalf of Plaintiff, it still fails.  Plaintiff testified that all MTMs were qualified for the three assignments and that he didn't see any difference between his ability and that of other employees.  Notably, Plaintiff has not shown that his deposition testimony regarding other employees' qualities was based on any type of "personal knowledge of [those employees'] qualifications[.]"  *Balderston*, 328 F.3d at 322; *cf. Sublett*, 463 F.3d at 740 ("An employee's self-serving statements about his ability are insufficient to contradict an employer's negative assessment of that ability.") (citation and alterations omitted).  Nonetheless, Plaintiff's personal opinions about the quality of his performance and that of his co-worker's are irrelevant in proving pretext.  *See Balderston*, 328

---

[5]    Plaintiff stated in his deposition that he did not take any tests to evaluate his qualifications for the different assignments.  (Pl. Dep. at 52.)  Defendant, however, submitted the testing records showing Plaintiff's score.  (8/14/06 Reinhold Aff. ¶ 14 & Ex. B-3.)  Nevertheless, even if we forgo the test scores in our analysis, it is still apparent that the other employees identified by Reinhold were vastly more qualified than Plaintiff.

F.3d at 323-24.  Rather, Plaintiff must show that Defendant "did not honestly believe in the reasons it gave . . . ." *Krchnavy*, 294 F.3d at 876.  He has made no such showing.

Likewise, Plaintiff has not responded to Defendant's reasoning behind Plaintiff's lack of training.  Defendant argues that Plaintiff never took advantage of training opportunities because the supervisors' way of training and the hours were inconvenient to him.  In his deposition, Plaintiff states that everyone received training during their regular hours and everyone was simply thrown on the job.  Again, more than these conclusory statements, which Plaintiff has not shown is within his personal knowledge, is needed to show that Defendant's reason is a pretext. *See Peters*, 307 F.3d at 547 n.10 (statements outside personal knowledge or statements that are the result of speculation or conjecture or merely conclusory is not admissible for summary judgment purposes); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) ("[B]are allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment.") (citation omitted).  The "burden of demonstrating pretext is on [Plaintiff] who must show that 'the employer's proffered reasons are factually baseless, were not the actual motivation for the [adverse employment action] in question, or were insufficient to motivate the [adverse action]." *Peters*, 307 F.3d at 548.  Plaintiff has not met this burden.

Similarly, Plaintiff has not offered any evidence to prove that Defendant's decisions regarding overtime were a pretext for discrimination.  Defendant asserts that Plaintiff was not offered very much overtime because he did not advise his supervisors that he was interested in overtime.  Plaintiff conceded as much in his deposition, and has not argued that such a reason is a pretext.

Finally, the two supervisors in this case did not even know that Plaintiff was Puerto

16

Rican until Plaintiff filed his claims of discrimination, and Plaintiff confirmed that fact.  It is difficult to see how the supervisors' reasons could be deemed a pretext for unlawful national origin discrimination when they were unaware of the national origin that they supposedly had animus towards.  Although this case was not brought as a race discrimination claim, it's worth pointing out that two of the employees who received favorable job assignments were Hispanic, although they were not Puerto Rican.

In sum, Defendant's actions were all within the realm of its managerial discretion.  We are not here to second guess such decisions.  *See Traylor v. Brown*, 295 F.3d 783, 790 (7th Cir. 2002) ("[W]e do not sit as a super-personnel department over employers scrutinizing and second-guessing every decision they make[.]"); *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435-36 (7th Cir. 2005).  This is particularly true in cases like this, where Plaintiff has offered **zero** evidence that Defendant's reasons are pretexts.  In fact, Plaintiff makes absolutely **no** argument regarding pretext in his Response.  Accordingly, Plaintiff has failed to carry his burden in showing that Defendant's stated reasons were pretextual.

**B.      Retaliation**

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.  *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002) (citing 42 U.S.C. § 2000e-3(a)).  A plaintiff has two means of proving retaliation: the "direct method" and the "indirect burden-shifting method."  *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).  Under the direct method, two types of evidence may be presented: (1) direct evidence, which "essentially requires an admission by the decision-maker that his actions were based upon the prohibited

animus;" and (2) circumstantial evidence, which "allows a jury to infer intentional discrimination by the decision-maker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted).  In this case, Plaintiff does not argue that he can establish retaliation by using the direct method.  He only acknowledges the adapted *McDonnell Douglas* burden-shifting test for proving retaliation.  (Pl. Resp. at 10.)

Nevertheless, construing Plaintiff's arguments liberally, he appears to rely upon his testimony that Reinhold didn't like to be named in complaints as proof of retaliation under the direct method.  But this lone statement is not enough to prove retaliation, particularly when Plaintiff has not explained who gave Plaintiff this information or why he believed this to be true. *See Mannie v. Potter*, 394 F.3d 977, 983-84 (7th Cir. 2005) (plaintiff's evidence that her supervisor viewed her discrimination charge negatively was insufficient to prove retaliation where plaintiff had no record support for the assertion and failed to specify who allegedly advised plaintiff of her supervisor's purported disapproval of the filings).

Under the indirect method test, Plaintiff must show that "(1) after lodging a complaint about discrimination; (2) only [he], and not any otherwise similarly situated employees who did not complain; was (3) subjected to an adverse employment action even though (4) [he] was performing [his] job in a satisfactory manner." *Sublett*, 463 F.3d at 740 (citation omitted).  Once a plaintiff establishes a *prima facie* case, the employer may still be entitled to summary judgment "unless there is a material issue of fact as to whether the employer's non-invidious reason is pretext for retaliation." *Id.* (quotations and citation omitted).

Plaintiff argues that Reinhold retaliated against him by not giving the preferable job assignments or training that was promised to Plaintiff after his grievance was settled.  (Pl. Resp.

18

at 9-10.)  In his deposition, Plaintiff made several statements asserting retaliation.  (*See, e.g.*, Pl.

Dep. at 30 ("I think Reinhold discriminated against me and played favoritism for junior

employees over senior employees, myself for one, and discriminated against me because I filed a

complaint of discrimination on him with the union first."); *id.* at 34 ("I think that's why he didn't

give me my training in my grievance that I filed because I filed a grievance on him of

discrimination . . . .").

Nevertheless, Plaintiff has not established a *prima facie* case for retaliation.  He has

failed to present any evidence to meet the similarly situated requirement under the indirect

method.  *See Rogers*, 320 F.3d at 755 (affirming summary judgment of retaliation claim when

plaintiff "cannot produce competent evidence that [he was] treated differently than similarly

situated employees").  As previously shown, none of the individuals he mentioned during his

deposition (who allegedly received better job assignments) was similarly situated to him.  If

anything, Plaintiff's deposition testimony indicates that non-Puerto Rican employees who did

not complain of discrimination also did not receive preferable job assignments or training.  (Pl.

Dep. at 33.)  Plaintiff has not shown whether these employees ever received better job

assignments or training.  In fact, Plaintiff even once noted in his deposition that nobody was

given training.  Therefore, the Court cannot determine whether similarly situated employees who

did not complain were treated any differently than Plaintiff.  *See Rogers*, 320 F.3d at 753

(agreeing with the district court that "the evidence does not support the inference that [the

plaintiff] was being singled out").

It is up to Plaintiff to establish his *prima facie* case, and he has not done so.  *See*

*Kampmier*, 472 F.3d at 940 (holding that the plaintiff's retaliation claim cannot survive summary

judgment when she has not identified a similarly situated individual).  Thus, it is unnecessary for us to reach the issue of pretext in the context of Plaintiff's retaliation claim.  *See Mannie*, 394 F.3d at 984 (finding that the court need not reach the pretext analysis in a retaliation claim where plaintiff has not demonstrated a *prima facie* case).

**CONCLUSION**

Plaintiff has failed to carry his burden for both his discrimination and retaliation claims.  Accordingly, Defendant Indiana Harbor's Motion for Summary Judgment [DE 41] is **GRANTED**.  The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant Indiana Harbor, stating that Plaintiff Antonio Rodriguez is entitled to no relief.  The clerk shall treat this civil action as **TERMINATED**.  All pending dates in this case are **VACATED**.

**SO ORDERED.**

ENTERED: March 5, 2007

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT